**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**HAROLD GENE DYER, JR.,**

     **Plaintiff,**

**vs.**                                    **CIVIL ACTION NO. 2:20-CV-00402**

**ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered June 15, 2020 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 13, 14)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for entry of an award for benefits or alternatively, remand (ECF No. 13); **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 14); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

**Procedural History**

The Plaintiff, Harold Gene Dyer, Jr., (hereinafter referred to as "Claimant"), protectively filed his application for benefits on or about December 28, 2017, alleging disability since April 30, 2017 due to a brain stem stroke, Bell's palsy, diabetes, arthritis "throughout" his body, neuropathy, tinnitus, and sleep apnea. (Tr. at 181-184, 224) His claim was initially denied on May 2, 2018 (Tr. at 110-114) and again upon reconsideration on July 9, 2018 (Tr. at 119-125). Thereafter, Claimant filed a written request for hearing on July 18, 2018 (Tr. at 126-127).

An initial administrative hearing was held on August 1, 2019 before the Honorable Nathan Brown, Administrative Law Judge ("ALJ") (Tr. at 36-75). On September 26, 2019, the ALJ entered an unfavorable decision. (Tr. at 12-35) On November 25, 2019, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 180, 285-288) The ALJ's decision became the final decision of the Commissioner on June 2, 2020 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On June 15, 2020, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (ECF No. 13), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 14). Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 46 years old as of the alleged onset date, thus determined to be a "younger person" throughout the underlying proceedings. See 20 C.F.R. § 404.1563(c). (Tr. at 29) Claimant has a high school education and received additional training as a truck driver. (Tr. at 225) Claimant

last worked as a truck driver, but his duties included loading and unloading rail equipment. (Tr. at 62-63) He stopped working after he suffered a stroke on April 30, 2017. (Tr. at 48)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant filing for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims, 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The

Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Section 404.1520a(c). That Section provides as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 to this subpart.
>
> (4) When we rate the degree of limitation in the first three functional areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following

4

five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant meets the requirements for

insured worker status through December 31, 2022. (Tr. at 17, Finding No. 1) Next, the ALJ determined that Claimant had not engaged in substantial gainful activity since April 30, 2017, the alleged onset date. (Id., Finding No. 2)

At the second inquiry, the ALJ found that Claimant had the following severe impairments: obesity; diabetes mellitus (DM) with neuropathy; Bell's palsy; cerebrovascular accident (CVA); mild vascular neurocognitive disorder; right shoulder rotator cuff tear and status-post repair; obstructive sleep apnea (OSA); osteoarthritis (OA); and posttraumatic stress disorder (PTSD). (Id., Finding No. 3)

At the third inquiry, the ALJ concluded that Claimant's impairments or combination thereof did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 19, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform sedentary work

> except he can lift and carry up to 20 pounds occasionally and 10 pounds frequently. He could sit for 6 hours in a day, but stand or walk for only 2 hours in a day. The limitations on pushing and pulling are the same as lifting and carrying. He can operate foot controls bilaterally frequently. He can operate hand controls with the left hand frequently. He can frequently reach in all directions bilaterally. He can handle and finger items frequently with the left hand. He frequently needs a cane for ambulation and balancing. He can climb ramps and stairs occasionally, but never climb ladders, ropes, or scaffolds. He can balance, kneel, and crouch occasionally, stoop frequently, and never crawl. He should never work at unprotected heights or work with hazardous or heavy machinery. He should operate a motor vehicle only occasionally. He can work frequently in extreme cold and vibration. He is able to perform simple, routine tasks and could make simple work-related decisions. He is able to perform simple, routine tasks and could make simple work-related decisions. He is able to interact with supervisors and coworkers occasionally, and never interact with the public, except for incidental contact. He is further limited to working in a low-stress environment, defined as no fast-paced production or strict time quota requirements. He should have no supervisory responsibilities.

(Tr. at 23, Finding No. 5)

At step four, the ALJ found Claimant was not capable of performing his past relevant work. (Tr. at 29, Finding No. 6) At the final step, the ALJ determined that in addition to the immateriality of transferability of job skills, Claimant's age, education, work experience and RFC, there were other jobs that existed in significant numbers in the national economy that Claimant can perform. (Id., Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from April 30, 2017 through the date of the decision. (Tr. at 30, Finding No. 11)

### Claimant's Challenges to the Commissioner's Decision

In support of his appeal, Claimant asserts that the ALJ failed to properly consider the medical evidence resulting in both a flawed RFC assessment and credibility analysis. (ECF No. 13 at 4) Claimant indicates that the ALJ disregarded the opinion/findings of both Kip Beard, M.D., and Melinda K. Henline, M.A., consultative examiners. (Id. at 5-6) Claimant contends that the ALJ's finding that his subjective complaints were inconsistent with the medical and other evidence of record is unreasonable, because his physical and mental impairments prevent substantial gainful activity at all exertional levels. (Id. at 6-7) Claimant argues that the ALJ's sedentary RFC assessment is contrary to the medical record as well as to Claimant's testimony. (Id. at 7-8) Finally, Claimant states that based on Claimant's testimony and evidence, the ALJ should have accepted the vocational expert's testimony that Claimant would not be able to maintain employment due to absenteeism, being off task greater than 15%, or requiring redirection beyond the first thirty days of employment. (Id. at 8) Claimant asks this Court to reverse the final decision to award benefits or alternatively, to remand for further proceedings. (Id. at 8-9)

In response, the Commissioner asserts that the ALJ properly considered the findings of the psychological and medical consultative examiners under the new Regulations governing same: the

ALJ explained why he found Ms. Henline's finding that Claimant would need assistance in managing any funds if awarded benefits "less persuasive" because it was inconsistent with the evidence of record; the ALJ considered Ms. Henline's abnormal mental status findings and accommodated those in the RFC assessment; and to the extent Claimant suggests the ALJ should have weighed Dr. Beard's findings as opinions, the ALJ is no longer obligated to do so under the new Regulations, plus these are not considered medical opinions under the pertinent Regulations. (ECF No. 14 at 13-16) The ALJ also complied with the pertinent legal authority and examined the relevant evidence of record and provided an explanation for the Claimant's RFC assessment as well as why the ALJ concluded Claimant's subjective complaints were not fully supported by the record. (Id. at 16-19) The Commissioner argues that the ALJ properly did not accept the vocational expert's testimony that was based upon assumed limitations that were not supported by the record. (Id. at 19-20) Finally, the Commissioner states that the final decision is supported by substantial evidence and asks this Court to affirm. (Id. at 20)

**The Relevant Evidence of Record**[1]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

The Medical Record From the Relevant Period:

On April 30, 2017, Claimant was admitted to the hospital due to an ischemic stroke (Tr. at 706). About a month later, Claimant followed up with his primary care provider at the VA Medical Center, who noted that he had not been treated in almost a year (Tr. at 1202). Although Claimant complained of a headache, he denied syncope (fainting) (Tr. at 1203). On examination, his motor

---

[1] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

strength was normal, but he had left sided facial paralysis and weakness in his legs (Tr. at 1204). He was unable to close his left eye for which he was given short-term steroids (Tr. at 1205). Treatment notes indicate that Claimant's diabetes had been poorly controlled in the past and that Claimant was "very against starting insulin yet as he will lose his CDL license" (Tr. at 1203, 1205).

Examinations throughout 2017 revealed extremity weakness and an unsteady gait at times, but other times Claimant ambulated with a steady gait, moved all four extremities spontaneously, had good range of motion of all joints, normal (5/5) strength in all four extremities, no muscle weakness or atrophy, normal reflexes, intact sensation in all four extremities, and no evidence of swelling or deformity in his joints (see, e.g., Tr. at 436, 457, 478, 481, 486, 496, 499, 508, 518, 548, 598, 1204). He generally denied fatigue, joint swelling, stiffness, or pain (Tr. at 554, 571, 597). Additionally, evaluations revealed that Claimant was generally awake and alert; cooperative; oriented; able to spell "world" backwards; a good historian; able to answer open-ended questions appropriately; and had fluent speech and intact comprehension (see, e.g., Tr. at 398, 508, 512, 701).

Although Claimant complained of dizziness, lightheadedness, headaches, left sided weakness, or vision loss at times, imaging of his head and chest were generally normal (see, e.g., Tr. at 310-313, 315, 322). For example, in July 2017, he received treatment for facial weakness and ataxia (Tr. at 1113). An MRI of his brain showed a lacunar infarct; an MRA of his neck was normal and Claimant was discharged in improved and stable condition (Tr. at 1348). In November, Claimant reported taking his medications and felt "pretty good" (Tr. at 456). In December, he sought treatment at the emergency room for weakness (Tr. at 1675). On examination, although he had a tremor in his left upper extremity and a droop on the left side of his mouth, his speech was

normal, and his muscle strength was symmetric (Tr. at 1677). An MRI of his brain showed no acute cerebrovascular accident or intracranial hemorrhage (Tr. at 1678).

A CT scan of Claimant's brain in January 2018 showed no evidence of high-grade stenosis or aneurysm (Tr. at 746). Examinations throughout 2018 showed some abnormal left shoulder range of motion, an antalgic gait, decreased left facial sensation, and some abnormal sensory examinations in his feet (Tr. at 837, 849-850, 889); however, Claimant was generally alert and oriented with a normal mood and affect, exhibited no swelling or muscle atrophy, had "fair" to "good" balance, normal motor tone, "good" muscle strength in his lower extremities with "no signs of instability," good range of motion of all joints, normal movement of all extremities, and intact sensation in his arms and legs (Tr. at 764, 784, 792-793, 837, 840, 849, 888-889, 1580). In August and September 2018, records indicated that he ambulated independently, and his gait was normal (Tr. at 840, 889).

In April 2018, Claimant saw Kip Beard, M.D., for an internal medicine examination (Tr. 726-733). Claimant complained of blurred vision, left arm and leg weakness, joint pain in his hands, wrists, shoulders, hips, knees, and ankles, and numbness and pain in his feet and toes (Tr. at 726). On examination, his gait was slow with a left limp (Tr. at 728). He appeared unable to walk on his heels or toes and could not stand on his left leg unassisted (Id.). There was no edema in his extremities (Id.). Range of motion testing revealed pain in his thoracic and lumbar spine (Tr. at 729). Although his hands revealed pain and tenderness, there was no atrophy, Claimant could make a full fist, extend his fingers and thumbs, write with his dominant hand, pick up a coin with either hand without difficulty, tie a string using both hands, and button using both hands (Id.). Notably, neurological testing showed submaximal effort (Tr. at 730). Claimant's left grip strength

appeared weak and was graded 4/5, but his strength was otherwise "preserved" and graded 5/5 (Id.). Dr. Beard did not render an opinion regarding Claimant's functional abilities.

Claimant went to the hospital for complaints of vertigo in May 2018 (Tr. at 825, 1560). Although an EKG showed "borderline T abnormalities," a CT of his head showed no acute intracranial findings (Tr. at 825, 830, 1560). Claimant was admitted to the hospital after his labs showed hyperglycemia with glucose (Tr. at 826). His symptoms resolved the next morning at which time he had no focal neurologic deficits (Id.). He was assessed with "likely benign positional vertigo" (Tr. at 825).

An MRI of Claimant's brain from September 2018 showed "mild" generalized cortical atrophy and posterior fossa atrophy; no significant white matter abnormality (Tr. at 872). A CT of his cervical spine at this time was "similar to the CT scan performed on December 15, 2017" (Tr. at 873-874). It was a "normal cervical spine series" (Tr. at 875).

In November 2018, Claimant saw his primary care physician for shoulder pain, which started while lifting weights (Tr. at 1843-1844, 2144). On examination, he had an antalgic gait, but moved all four extremities spontaneously and had good range of motion of all joints (Tr. at 1846). A neurological examination was normal (Tr. at 1845). Claimant was given a corticosteroid injection and was referred to physical therapy (Tr. at 2144).

About a month later, Claimant started treating at a foot and ankle clinic, where he complained of burning, tingling, and numbness in his feet (Tr. at 1793). He was assessed with diabetes with neuropathy and given diabetic shoes and prescribed Gabapentin (Id.).

In January 2019, Claimant complained of numbness in the lower extremities and his right hand (Tr. at 2106-2107). On examination, although he had diminished sensations in his lower

extremities below both knees, he was in no acute distress, had "good" muscle bulk and tone, no edema in his upper body or lower extremities, and a normal gait (Tr. at 2108).  An electrodiagnostic study showed some generalized neuropathy in the lower extremities but no evidence of ongoing denervation process (Tr. at 2110).

In February and May 2019, Claimant returned to the foot and ankle clinic complaining of burning, tingling, and numbness in his feet (Tr. at 1791-1792). He was prescribed orthotics (Id.).

In May 2019, Claimant underwent an arthroscopic rotator cuff repair of his right shoulder (Tr. at 2057).  He reported he was able to perform activities of daily living on his own with no assistive devices (Tr. at 2075). Treatment notes indicate he could climb a flight of stairs without shortness of breath (Tr. at 2076).

In June 2019, Claimant saw a nurse practitioner for his diabetes (Tr. at 1805). On examination, although his hands exhibited a rapid tremor, he was in no acute distress, his feet were not swollen or tender, and his deep tendon reflexes were normal (Tr. at 1807). On examination later in the month, Claimant moved all four extremities spontaneously, had good range of motion in all joints, and had a normal neurological examination (Tr. at 1984).  He was to continue his medications and increase Gabapentin for his foot pain (Tr. at 1985). He was also referred to physical therapy for his osteoarthritis and was to start using a gel (Id.). He was further advised to stop smoking, use alcohol appropriately, exercise, and attain a healthy weight (Tr. at 1991).

Also in June 2019, Claimant was sent for a substance abuse consult "by the neuropsychological people" who told him that his "continued dizziness may be caused by the alcohol" (Tr. at 1996-1999). He reported that he spent his days laying "on the couch . . . consum[ing] large amounts of alcohol" (Tr. at 2023). On examination, although his judgment was

poor, his attention and concentration were intact; his cognitive functions were intact; he was alert and oriented; he was cooperative and friendly; and he had normal speech and a euthymic mood (Tr. at 2009-2010). An objective personality assessment indicated "overreporting of psychological disturbance and exaggeration of somatic and cognitive complaints" (Tr. at 2025-2026).

In July, Claimant participated in outpatient therapy for his alcohol use disorder (Tr. at 1977). He endorsed drinking as many as fifteen drinks one to two days per week (Id.). A mental status evaluation revealed that he was adequately groomed; cooperative and pleasant; had a euthymic affect; normal speech; normal thought content; a goal-oriented thought process; he was alert and oriented; his judgment and insight were intact; and his attention and concentration were normal (Tr. at 1978). His gait was also normal (Id.).

Opinion Evidence and Prior Administrative Decisions:

In March 2018, Claimant underwent neuropsychological screening with Melinda Henline, M.A. (Tr. at 718-725). He reported he went to the store, ate at restaurants, exercised, attended medical appointments, had friends, paid bills, and managed his own money (Tr. at 724). His gait was "slow" with a limp (Tr. at 718). On examination, although he had a restricted affect, his mood was depressed, and he made "fleeting" eye contact, he was friendly and cooperative; had coherent speech; and his thought content was normal (Tr. at 723). He was noted to stare off into space at times and had to be prompted to participate in the interview (Id.). Although his concentration was "mildly" impaired, his immediate memory was intact (Id.). His pace was variable (Id.). Ms. Henline diagnosed Claimant with mild vascular neurocognitive disorder (Id.). She opined that Claimant "may need assistance managing funds should an award be made" (Tr. at 724), but did not render an opinion regarding any other abilities.

13

On April 4, 2018, Frank Roman, Ed.D., an expert state agency psychologist, reviewed Claimant's medical records and opined that he had no more than moderate limitations in any area of mental functioning (Tr. at 83-84). Dr. Roman opined that Claimant could carry out routine, 1–3 step repetitive tasks, in a low pressure setting with minimal change in routine and little decision making (Tr. at 90). He further stated that Claimant should not perform supervisory duties or work in a fast production setting (Id.). In June 2018, Jeff Boggess, Ph.D., reviewed Claimant's medical records at the reconsideration level and affirmed Dr. Roman's assessment (Tr. at 99).

In May 2018, state agency physician Palle Reddy, M.D., reviewed Claimant's records and opined that Claimant could perform light work, except he could never climb ladders, ropes, or scaffolds; could frequently climb ramps or stairs, stoop, crouch, and reach; occasionally crawl, kneel, and balance; had to avoid moderate exposure to workplace hazards and concentrated exposure to extreme temperatures, noise, and vibration (Tr. at 85-88). In June 2018, Rabah Boukhemis, M.D., reviewed Claimant's medical records at the reconsideration level and affirmed Dr. Reddy's assessment of Claimant's physical residual functional capacity (Tr. at 101-104).

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that his medical providers advised he not drive, though conceded he drives once or twice a week but short distances. (Tr. at 45) He normally has someone with him when he drives because he gets lost. (Id.) He has a service-connected VA for tinnitus, which he estimated to be around 5-10%. (Tr. at 46)

Claimant testified that his vision is constantly blurry, but his eyeglasses help some. (Tr. at 48) He also endorsed constant dizziness, but has "dizzy days" three to four days a week. (Tr. at

14

49) Claimant also stated he has weakness mainly on his left side as a result of his stroke; he only fell once, but he stumbles constantly. (Tr. at 50) He is supposed to use a cane to walk, but he tries "not to depend upon it"; the cane was prescribed. (Tr. at 50-51) Claimant's Bell's palsy causes his face to droop on the left side. (Tr. at 51) Claimant also gives himself twice daily injections of insulin for his diabetes. (Id.) Claimant has constant numbness, burning, and tingling in his legs and feet as well as joint pain throughout his body all the time. (Tr. at 52-53) He does not have a pain-free day and exertion makes the pain worse. (Tr. at 53) He has not found anything that lessens his pain, although stated since "they fixed the shoulder", it is a little better, and rated his pain between 5 and 7. (Tr. at 53-54)

Claimant stated he has difficulties with sleep, but attributes that to a "mental matter" caused by his PTSD; he has dreams and flashbacks. (Tr. at 54) He sleeps during the day because he started "swinging" in his sleep and doesn't want to hurt his girlfriend; he said his girlfriend says he tosses and turns a lot. (Tr. at 55) He is easily fatigued and worn out and rests during the day. (Tr. at 55-56) However, he said on a good day, he can use the riding mower to cut grass, but that's about it. (Tr. at 56) He can walk about a block, but he has to take his time because of dizziness. (Tr. at 56-57) He admitted that he lifted weights at home because he can do them while sitting; since having his stroke, he has things "strategically placed for [his] balance issues", but does not have bars in his shower, as he has a shower chair. (Tr. at 64-65)

Claimant testified that he isn't supposed to lift anything heavier than a milk jug with the right arm since his shoulder surgery, but he could lift 20 to 30 pounds with the left arm. (Tr. at 58) He stated that he has a pool, and he is fine in it, except getting out of the pool is "too much". (Tr. at 58-59)

15

Claimant testified that he is able to attend to his personal needs and tries to help with dishes or sweeping, but can't stand too long. (Tr. at 59) He stated that he has memory problems and needs reminders for appointments to take his medication and other things. (Tr. at 60) He testified that he did not believe he could work an office-type job because of pain and if awarded benefits, he would have his girlfriend handle them since she takes care of all the finances and he can't. (Tr. at 63-64) His girlfriend is also disabled due to her "feet and anxiety." (Tr. at 65)

Claimant advised he no longer enjoys prior hobbies, such as riding a motorcycle and side-by-side; he tried to ride his side-by-side but got lost in the woods and his girlfriend couldn't walk and neither couldn't figure out how to get back so they no longer do that anymore. (Tr. at 66) He goes to the store once or twice a week, but is embarrassed because of his mobility issues; he has grandchildren that visit, but he can no longer play with them; he does not attend church or any clubs and avoids crowds. (Tr. at 67)

<u>Vocational Expert ("VE") Testimony:</u>

After listening to Claimant's testimony, the VE considered several hypothetical questions posed by the ALJ with regard to an individual with Claimant's functional profile (Tr. at 68-71). The VE then testified that an individual of Claimant's age, education, and vocational background who had Claimant's limitations as described in the RFC, *supra*, would be able to perform sedentary jobs that exist in significant numbers in the national economy, such as final assembler, sorter, or table worker (Tr. at 71). The VE further stated that if the individual were to be off task for 15% of the workday, or was absent from work two days per month, then there would be no work available. (Tr. at 71-72) The VE testified that if an individual is having numbness or tingling in their extremities, then that could have an impact on the ability to frequently reach, handle and finger,

which is required for the jobs she identified. (Tr. at 73) Additionally, the VE testified that if an

individual was unable to remain on task and had to be redirected after 30 days, then that would not

be a competitive employment setting, but a sheltered workshop setting. (Id.)

## Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying

the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was

defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular
> conclusion. It consists of more than a mere scintilla of evidence but may be
> somewhat less than a preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d

640, 642 (4th Cir. 1966)).  Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence, however, the Court determines if the final decision of the Commissioner

is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th

Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape

their duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists,

the Court must affirm the Commissioner's decision "even should the court disagree with such

decision." Blalock, 483 F.2d at 775.

## Analysis

As noted *supra*, Claimant has taken the position that in addition to the ALJ's failure to

properly consider the medical evidence as it related to the RFC analysis and credibility assessment,

discussed *infra*, he also "inexplicably" disregarded the findings from the examinations performed

by Dr. Beard and Ms. Henline. (ECF No. 13 at 5, 6)

   <u>The ALJ's Consideration of the Medical Record:</u>

   In a conclusory fashion, Claimant asserts that the medical records supported his claims of disabling impairments – while he does not specify which impairment specifically meets or equals any Listing, he emphasizes that his testimony is corroborated by Dr. Beard's and Ms. Henline's findings and that his left-sided weakness from his stroke show he cannot perform sedentary work. (<u>Id</u>. at 5-8)

   The Regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

See 20 C.F.R. § 404.1523(c). When confronted with a combination of impairments, an adjudicator must not only acknowledge "the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 398 (4th Cir. 1974). The Fourth Circuit has held that the ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. <u>Id</u>. In short, the ALJ must analyze the cumulative or synergistic effect that the various impairments have on Claimant's ability to work. <u>DeLoatche v. Heckler</u>, 715 F.2d 148, 150 (4th Cir. 1983).

   "The Listing of Impairments . . . describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity,

regardless of his or her age, education, or work experience." See 20 C.F.R. § 404.1525(a); Sullivan v. Zebley, 493 U.S. 521, 532 (1990). To qualify for benefits, Claimant must show that his combination of impairments is "equivalent" to a listed impairment, and he "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." See Id. at 531. A claimant must meet all, not just some, of the criteria for a listing to apply. Id. at 530.

It is important to note that at the second step in the sequential evaluation process, the ALJ found numerous impairments that were not severe enough to have significantly limited Claimant's ability to perform basic work activities: alcohol use disorder; hypertension; hyperlipidemia; gastroesophageal reflux disease (GERD); genital lesions; mild scoliosis; and tinnitus (Tr. at 18-19) The ALJ found that none of these impairments caused any significant limitations in functioning or did not last for a continuous period of twelve months and the records did not demonstrate he had any worsening of these conditions. (Tr. at 18-19, 831, 2025, 825, 906, 1983, 1806, 1985, 316, 874, 1362) The ALJ also stated that he considered "all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's [RFC]." (Tr. at 19)

Next, at the third step of the sequential evaluation process, the ALJ evaluated Claimant's impairments under Section 1.00 which pertains to the musculoskeletal system. (Id.) He noted that while the records show Claimant had osteoarthritis, it was treated conservatively, and that Claimant was found to have generally normal examination findings during the relevant period. (Tr. at 19, 313-314, 321-322, 326, 720-721, 723, 728-731, 1046, 746, 765, 770, 784, 795, 804, 830, 832, 840, 845, 855, 897, 900-901, 1026-1028, 1038, 1046, 1111, 1166, 1549, 1564, 1580, 1791, 1807, 1931, 1936, 1967, 1977, 1984, 2022-2023, 2025, 2066, 2079, 2110, 2179)[2]

---

[2] The ALJ referenced hospital records, including medications, a radiology report, ECG studies, and progress notes from the Huntington VA Medical Center dated March 17, 2016 to December 27, 2017; selected pages from Ms.

With regard to Listing 1.02, which concerns major dysfunction of a joint due to Claimant's right shoulder injury and surgery, the ALJ recognized that the record supports a finding that Claimant had a right shoulder injury and repair, however, treatment notes indicated he healed well and there was no consistent degenerative condition following the surgery, and that no acceptable medical source indicating that Listing requirements had been met. (Tr. at 19, 900-901, 1807, 2066)[3]

With regard to Claimant's obstructive sleep apnea pursuant to Listing 3.00 for respiratory systems, the ALJ noted the record did not support a finding that this met Listing requirements, as Claimant was "successfully managing this impairment with use of a CPAP machine" and no testifying medical source indicated Listing requirements were met. (Tr. at 19-20, 1549)[4]

With regard to Claimant's diabetes mellitus, the ALJ considered the Listing requirements under Section 9.00 concerning endocrine disorders, and determined that this impairment did not meet the Listing: while Claimant had elevated glucose levels due to poor diet and exercise, his

Henline's neuropsychological screening report; selections from Dr. Beard's internal medicine examination; progress notes from the Huntington VA Medical Center dated June 6, 2016; a radiology report from the Huntington VA Medical Center dated January 8, 2018; a progress report from the Huntington VA dated June 10, 2018; a progress note from the Huntington VA dated May 23, 2018; a progress note from the Huntington VA dated April 27, 2018; a progress note from the Huntington VA dated March 2, 2018; a May 16, 2018 CT scan of Claimant's head; a May 23, 2018 preliminary report concerning a referral to St. Mary's Medical Center for sleep apnea; a progress note from the Huntington VA dated August 2, 2018; a progress note from the Huntington VA dated July 6, 2018; an echocardiographic report dated August 29, 2018; a progress note from the Huntington VA dated September 21, 2018; a progress note from the Huntington VA dated April 30, 2017; a progress note from the Huntington VA dated June 17, 2016; a progress note from the Huntington VA dated June 6, 2016; a progress note from the Huntington VA dated July 6, 2017 and July 5, 2017; an order form for CPAP equipment dated May 24, 2018; a May 16, 2018 radiology report concerning Claimant's chest; a progress note from the Huntington VA dated August 2, 2018; a treatment note from the Huntington Foot & Ankle Clinic dated May 14, 2019; a treatment note from Marshall Health dated June 19, 2019; a consult request concerning substance abuse from the Huntington VA dated June 25, 2019; a consult request for nerve conduction studies from the Huntington VA dated January 8, 2019; progress notes from the Huntington VA dated July 1, 2019, June 25, 2019, May 15, 2019 and May 13, 2019; a neuropsychological testing report from the Huntington VA dated June 11-12, 2019; a nerve conduction study report from the Huntington VA dated January 8, 2019; and an initial evaluation for ataxia from St. Mary's Rehabilitation Services dated November 27, 2018.
[3] The ALJ cited progress notes from the Huntington VA dated September 21, 2018 and May 15, 2019 and a Marshall Health treatment note dated June 19, 2019.
[4] The ALJ referred to the order form for Claimant's CPAP machine.

symptoms improved with medication and no testifying medical source indicated this impairment met Listing requirements. (Tr. at 20, 295, 731, 825, 1026-1028, 1038, 1791, 1814, 1833)[5]

With regard to Claimant's cerebrovascular accident (CVA) and Bell's palsy, the ALJ noted that while the record supporting a finding that Claimant has these impairments, the findings were mild, along with generally normal physical examinations where Claimant demonstrated full strength and neurological capabilities at multiple points during the relevant period that did not fulfill Listing requirements pursuant to Section 11.04; additionally, the ALJ noted no medica source testified that these impairments met Listing requirements. (Tr. at 20, 313, 758, 765, 825, 1166)[6]

With regard to the Peripheral Neuropathy Section 11.14, the ALJ found the Listing was not met as there was no evidence of disorganization of motor function in two extremities resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities; further the ALJ noted that treating providers reported Claimant's symptoms were controlled with medication. (Tr. at 20, 731, 825, 1026-1028, 1038, 1791, 1814, 1833)[7]

With respect to Claimant's mental impairments, the ALJ leaned heavily on Ms. Henline's report and the June 25, 2019 consultative report from the Huntington VA concerning the substance abuse treatment program. (Tr. at 21-22, 718-725, 1936) The ALJ considered Claimant's allegation

---

[5] The ALJ cited Dr. Beard's report; a May 17, 2018 discharge summary from St. Mary's Medical Center; progress notes from the Huntington VA dated April 30, 2017 and June 17, 2016; a May 14, 2019 office note from the Huntington Foot & Ankle Clinic; and Marshall Health treatment notes dated June 13, 2019 and May 9, 2019.

[6] The ALJ cited a radiology report from the Huntington VA dated December 15, 2017; a physical therapy note from the Huntington VA dated May 30, 2018; a progress note from the Huntington VA dated June 10, 2018; and a discharge summary from St. Mary's Medical Center dated May 17, 2018.

[7] The ALJ cited Dr. Beard's report; the May 17, 2018 discharge summary from St. Mary's Medical Center; progress notes from the Huntington VA dated April 30, 2017 and June 17, 2016; a May 14, 2019 office note from the Huntington Foot & Ankle Clinic; and Marshall Health treatment notes dated June 13, 2019 and May 9, 2019.

that since his stroke, he suffered from short-term memory loss, resulting in his need for constant reminders to attend to chores or medical appointments. Because Ms. Henline found Claimant had a moderate deficiency in his ability to recall details of his personal history and a severely impaired recent memory, but he also exhibited linear thought process without atypical thought content during his evaluation at the VA, the ALJ determined he had a moderate limitation in understanding, remembering or applying information. In interacting with others, again, the ALJ found Claimant had a moderate limitation, relying on his testimony that he has difficulty being around other people and only leaves his house once or twice a week as well as Ms. Henline's finding he may have great difficulty in keeping up with his peers when verbal skills are required and his fleeting eye contact during the interview. However, the ALJ noted that both Ms. Henline as well as the VA provider found Claimant to be friendly and cooperative. In concentrating, persisting or maintaining pace, again the ALJ found moderate deficiencies, again relying on Claimant's testimony describing difficulties with attention, concentration and focus as well as Ms. Henline's observation that Claimant had moderate limitations in persistence; however, the ALJ also noted that Ms. Henline found Claimant's concentration "mildly" impaired with variable pace. Finally, in adapting or managing himself, the ALJ also found Claimant had moderate limitations, evidenced by his depressed mood, restricted affect, and impaired judgment during Ms. Henline's interview, but that Ms. Henline, as well as his VA provider noted Claimant also exhibited fair insight and an euthymic mood during examination. Accordingly, the ALJ found Claimant's mental impairments did not meet Listing criteria.

Clearly, the ALJ considered the medical evidence as well as Claimant's reported symptomology from the relevant time period. Regardless of Claimant's frequent recitation of the

various diagnoses and symptoms related thereto in his brief (ECF No. 13), this is not the litmus test for disability, as it is also well known that diagnoses alone do not establish disability, because there must be a showing of related functional loss. See <u>Gross v. Heckler</u>, 785 F.2d 1163, 1166 (4th Cir. 1986) (*per curiam*) (internal citations omitted). Nevertheless, as discussed *infra*, the ALJ did consider this evidence in rendering his decision, thus, to the extent that Claimant suggests that the ALJ failed to give proper consideration to the medical evidence of record and "downplay[ed]" (ECF No. 13 at 5) the severity of his impairments to find that he was not disabled, the undersigned **FINDS** this contention lacks merit.

Evaluation of Opinion Evidence:

To the extent that Claimant contends that the ALJ erred by not assigning any weight to Dr. Beard's findings, and his determining Ms. Henline's findings "not persuasive" (<u>Id</u>. at 5-6), the undersigned **FINDS** this argument also lacks merit. Because Claimant filed his application for benefits after March 27, 2017, the ALJ was under no obligation to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior medical finding(s), including those from your medical sources." See 20 C.F.R. § 404.1520c(a); (see also, Tr. at 27). Instead, the ALJ only had to evaluate the persuasiveness of a medical opinion or prior administrative medical finding using several enumerated factors, with supportability and consistency being the most important factors. <u>Id</u>. § 404.1520c(b)(2). In any event, as a practical matter it is best to review how the SSA defines "medical opinions":

> Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

Id. § 404.1527(a)(1). Other than Dr. Beard's diagnoses[8] after having interviewed Claimant and then reporting his observations upon examination, Dr. Beard provided no opinion with respect to what Claimant can still do despite his impairments. Likewise, other than determining that Claimant "may need assistance managing his funds should an award be made", Ms. Henline provided no opinion with regard to what Claimant was still capable of despite his mental impairment.[9] (Tr. at 724) As noted *supra*, the ALJ referenced Dr. Beard's report numerous times throughout the written decision (Tr. at 19, 20, 25, 28), thus to any extent that Claimant suggests that the ALJ may have "disregard[ed]" Dr. Beard's findings, this assertion also lacks merit. See, generally, Reid v. Commissioner of Social Sec., 769 F.3d 861, 865 (4th Cir. 2014) (" '[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision[.]' ") (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2006) (*per curiam*)); see also Call v. Berryhill, Civil Action No. 2:17-CV-02292, 2018 WL 4659342, *4 (S.D.W. Va. Sept. 28, 2018).

With respect to Ms. Henline's findings, the ALJ explicitly addresses her opinion that Claimant may need assistance managing any award, and though he acknowledged the record supported a finding that Claimant had non-exertional limitations, he did not find the evidence supported Ms. Henline's assessment that he was unable to manage funds, given that examination findings indicated he had linear thought process, no atypical thought content, only mildly impaired concentration with fair insight, and generally normal mental status examination findings "multiple times" during the relevant period. (Tr. at 28, 720-721, 723, 1931, 1936, 1977, 1984) Thus, the ALJ

---

[8] Following his review of systems and physical examination, Dr. Beard provided his impression: right Pontine infarction; ataxia; type II diabetes mellitus with neuropathy; joint pain, multiple sites; primary osteoarthritis, according to history; pain in the thoracic spine; low back pain; and intervertebral disc degeneration, according to history. (Tr. at 731)

[9] As noted *supra*, Ms. Henline diagnosed Claimant with mild vascular neurocognitive disorder. (Tr. at 723)

determined Ms. Henline's opinion as to Claimant's capabilities towards managing funds was "not persuasive."[10] Clearly, the ALJ complied with the pertinent legal authority, *supra*, and provided a reasonable explanation for why he found this particular opinion lacked supportability from and consistency with the evidence of record.

<u>Evaluation of Symptoms in Disability Claims:</u>

Claimant asserts that in spite of the ALJ's finding that Claimant's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely consistent with the record, that it would be "more reasonable to conclude" that Claimant's impairments are disabling. (ECF No. 13 at 6) Social Security Ruling ("SSR") 16-3p clarifies the evaluation of symptoms, including pain: 20 C.F.R. § 404.1529 require a finding of the extent to which an individual's statements about pain or other symptom(s) and its functional effects can reasonably be accepted as consistent with the objective medical evidence and other evidence; that explains the factors to be considered in assessing the consistency of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the consistency of the individual's statements.

The Ruling further directs that adjudicators use a two-step process for evaluating an individual's symptoms: first, it must be determined that the individual has a medically determinable impairment ("MDI") that could reasonably be expected to produce the individual's alleged symptoms; and second, the intensity and persistence of the individual's symptoms must be evaluated to the extent which they limit the individual's ability to perform work-related activities. <u>See</u>, SSR 16-3p, 2016 WL 1119029, at *3-4. This evaluation must be based on a consideration of

---

[10] Perhaps paradoxically, under the heading "Social Functioning Self-Reported", Ms. Henline noted that Claimant has a checking account, pays bills, and "manages his own money." (Tr. at 724)

all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. § 404.1529(c)(4). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons . . . Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

Id. § 404.1529(c)(3).

Moreover, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456

(4th Cir. 1990); <u>Davis v. Colvin</u>, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.")

    In addition to his review of Claimant's hearing testimony, *supra*, and following the discussion of the medical evidence, also detailed *supra*, the ALJ then "considered the claimant's reports of ongoing symptoms related to the claimant's Bell's palsy, CVA, DM with neuropathy, right shoulder rotator cuff tear and repair, OSA, OA, PTSD, and mild vascular neurocognitive disorder." (Tr. at 27) In addition, the ALJ stated that he considered Claimant's provider's report that Claimant was independent with his activities of daily living; that his blood glucose was "well controlled" when he followed his prescribed diet, though Claimant reported consuming a high carbohydrate diet and "eight to 12" sodas per day; and that Claimant was found to have generally normal physical and mental examinations with mild symptoms related to his impairments. (<u>Id</u>.) The ALJ also reviewed the opinion evidence provided by the psychological state agency consultants, including Ms. Henline's findings, *supra*, and compared that evidence with the other evidence of record. (Tr. at 27-28, 90, 106, 326, 720-721, 723, 1046, 784, 830, 832, 1791, 1807, 1931, 1936, 1977, 1984, 2079) The ALJ reviewed the opinion evidence provided by the medical state agency consultants, including Dr. Beard's findings, and compared that evidence with the other evidence of record. (Tr. at 28, 313-314, 321-322, 326, 720-721, 723, 728-731, 1046, 746, 765, 770, 784, 795, 804, 830, 832, 840, 845, 855, 897, 900-901, 1026-1028, 1038, 1046, 1111, 1166, 1549, 1564, 1580, 1791, 1807, 1931, 1936, 1967, 1977, 1984, 2022-2023, 2025, 2066, 2079, 2110, 2179) Ultimately, the ALJ found Claimant's statements about the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other

evidence in the record. (Tr. at 24)

In sum, despite Claimant's blanket assertion that the ALJ failed to properly consider the medical evidence of record and incorporate same into the credibility determination (ECF No. 13 at 8), it is clear that the ALJ considered the evidence from the relevant period when reconciling Claimant's statements with the objective medical records as well as the other evidence of record. Moreover, it is apparent that the ALJ properly considered the treatment provided for Claimant's severe impairments and compared those results with Claimant's subjective complaints – the impairment must also not "be reasonably controlled by medication or treatment[.]" See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). Nevertheless, there is no evidence from the record that Claimant's conditions caused him significant functional limitations that precluded all employment.

Accordingly, the undersigned **FINDS** the ALJ's credibility analysis, or rather, his evaluation of Claimant's symptoms pursuant to SSR 16-3p, is supported by substantial evidence.

The RFC Assessment:

As with the credibility determination, Claimant conclusively states that the ALJ also failed to properly consider the medical record when rendering the RFC assessment. (ECF No. 13 at 5, 8) Claimant provides no further development in support of this argument, save for the repeated recitation of diagnoses and symptoms the undersigned noted were reviewed by the ALJ in the written decision (Id. at 5-8)[11] To the extent that Claimant is arguing that the RFC assessment is not supported by substantial evidence, as noted *supra*, this Circuit has recognized that "there is no

---

[11] To be clear, Claimant refers repeatedly to the internal medicine examination report provided by Dr. Beard, and the entirety of Exhibit 22F, which concern progress notes from the Huntington VA dated September 26, 2018 to July 1, 2019. (Tr. at 726-733, 1977-2181) Claimant also refers to his own testimony endorsing his disability.

rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*)). Instead, an ALJ " 'must build an accurate and logical bridge from the evidence to his conclusion.' " Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). In this case, the ALJ provided more than sufficient notations from the record that documented Claimant's subjective complaints related to his physical impairments, which included not only his testimony regarding the stroke he suffered around April 30, 2017, but his symptoms related thereto, including his Bell's palsy, driving short distances, his memory and vision issues, dizziness, weakness from his left side from his stroke, his allegations of stumbling and falling, his limp, his cane use, his problems with compliance with his diabetic diet and constant burning, tingling, and numbness in his legs and feet as well as joint pain. (See, e.g., Tr. at 23-24), and compared these subjective complaints with the overall evidence before him (Tr. at 25-29). As noted *supra*, this included the opinion evidence provided by state agency medical consultants, Drs. Palle Reddy and Rabah Boukhemis, both of whom opined Claimant remained capable of a light level of exertion with certain postural and environmental limitations (Tr. at 28). Significantly, while the ALJ noted that their opinions were "generally consistent with the medical evidence of record and examination findings", the ALJ noted that Claimant's "ongoing issues with grip strength" indicated that Claimant was more limited during the relevant period and accordingly, determined Claimant required additional manipulative limitations, reducing him to only frequent handling and fingering with his left hand, and limited him further to only frequent operation of foot controls bilaterally, along with frequent use of a cane for ambulation and balancing. (Id.) The ALJ reasoned that the use of the cane was supported by documentation

showing Claimant had a slow gait with a wide stance, couple his own statements endorsing difficulties with balancing. (Id.) As noted above, the ALJ specifically references not only the medical evidence of record, but also Dr. Beard's observations during the examination in support of this physical RFC assessment in light of the opinion evidence. Moreover, despite Claimant's argument that he is unable to perform the frequent fine and gross manipulations required of most sedentary jobs, it is significant that Dr. Beard observed that Claimant remained capable of buttoning, picking up coins with either hand, writing with his dominant hand, and despite the 4/5 graded left grip weakness, nevertheless assessed his strength as "preserved" and graded 5/5; it also significant that the ALJ recognized this observation as well. (Tr. at 28, 730)

Additionally, to the extent that Claimant has argued that the ALJ "should have accepted" the vocational expert's testimony that Claimant was precluded from all work because he would "exceed the acceptable tolerances" for being off-task and absenteeism (ECF No. 13 at 8), outside of Claimant's own statements that he is incapable of all substantial gainful activity, Claimant points to no specific evidence in the record that supports this proposition. Similarly, Claimant's argument that the ALJ "should have accepted" the vocational expert's testimony that Claimant would have difficulty with consistent competitive employment if he required redirection beyond the first thirty days of employment because Ms. Henline's findings support this testimony is of no moment. (Id.) Though Claimant provides no specific "finding" that Claimant could only work in a "sheltered work situation", he ostensibly is referring to Ms. Henline's notation that Claimant "had to be reoriented to testing several times" during her evaluation (Tr. at 722). However, Claimant overlooks the fact that this Circuit has long since held that hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the

record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). As stated above, the reconciliation of conflicting evidence was for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7. The ALJ considered Ms. Henline's findings, and noted her opinions, but also compared this evidence with other evidence of record, which included not only her own findings that Claimant had only mildly impaired concentration, but also the observations of VA providers found Claimant's mental status throughout the relevant period generally normal. (Tr. at 28; see also Tr. at 21, 22) Given the foregoing review of the evidence of record, the undersigned **FINDS** that the vocational expert's responses to the ALJ's controlling hypothetical question were supported by substantial evidence, and further **FINDS** that the ALJ was entitled to rely upon those responses at the fifth step of the sequential evaluation process. See 20 C.F.R. §§ 404.1560(c)(2); 404.1566(e). In sum, the undersigned **FINDS** the RFC assessment is supported by substantial evidence.

Although Claimant advocates for an alternate decision, such are matters that involve resolving the conflicting evidence of record, which is an evidentiary finding within the purview of the ALJ. In short, though Claimant may disagree with the ALJ's determination that he can work at a sedentary exertional level for an eight-hour workday, this Court cannot re-weigh this conflicting evidence or substitute its judgment for the Commissioner's. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also, SSR 96-8p, 1996 WL 3741784, at *7.

In short, the ALJ's narrative of the record included the objective medical evidence, including imaging, and examination findings, as well as the other evidence of record, including Claimant's own statements and testimony; the ALJ's thorough discussion of all this evidence, and his ultimate determination that Claimant remained capable of sedentary work during the relevant

period despite his subjective complaints, provided sufficient explanation allowing for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). This Court is not "left to guess about how the ALJ arrived at his conclusions" therefore remand is not necessary. Mascio, 780 F.3d at 637.

Finally, the undersigned **FINDS** that the Commissioner's final decision determining that Claimant was not disabled from April 30, 2017 through the date of decision is supported by substantial evidence.

## **Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal or remand (ECF No. 13), **GRANT** the Defendant's request to affirm the decision below (ECF No. 14), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: January 20, 2021.



Omar J. Aboulhosn
United States Magistrate Judge